Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Steven Henesy, Esq.
Jennifer Abreu, Esq.
Conor E. Byrnes, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------- X

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY,

Docket No.:

Plaintiffs,

-against-

BHNV EXCLUSIVE INC. D/B/A 13TH AVENUE CHEMISTS, CHAIM DAYAN, JOHN J. MCGEE, D.O., and JOHN DOE DEFENDANTS "1" THROUGH "10",

Defendants.

---------------------------------------- X

**COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company (collectively, "GEICO" or "Plaintiffs"), as and for their Complaint against Defendants BHNV Exclusive Inc. d/b/a 13th Avenue Chemists ("BHNV Exclusive"), Chaim Dayan ("Dayan"), John J. McGee, D.O. ("Dr.

McGee"), and John Doe Defendants "1" through "10" (the "John Doe Defendants") (collectively, the "Defendants"), hereby allege as follows:

1. This action seeks to terminate a large, ongoing fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $3.7 million in fraudulent pharmaceutical billing to GEICO. The Defendants' scheme overwhelmingly targeted expensive topical prescription drug products, which they systematically dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO ("Insureds") in a predetermined protocol fashion, without regard for genuine patient care.

2. BHNV Exclusive purports to be a legitimate, neighborhood pharmacy operating in Brooklyn, New York, but in fact, has been used by its owner, Dayan (together with BHNV Exclusive, the "Pharmacy Defendants") as part of a large-scale fraud scheme to exploit patients for financial gain by overwhelmingly targeting topical drug products, purportedly prescribed to relieve pain, including primarily Diclofenac Sodium 2% Solution and LidoReal 4%-1% Patches (the "Fraudulent Topical Pain Products"), along with certain other oral prescription drug products (collectively, the "Fraudulent Pharmaceuticals"). The Pharmacy Defendants' fraud scheme began in January 2025 when Dayan partnered with a network of individuals and entities regularly involved in No-Fault insurance fraud who could arrange for and facilitate collusive arrangements and ensure the prescribing and steering of voluminous prescriptions to BHNV Exclusive.

3. As part of the fraudulent scheme and to maximize their profits, the Pharmacy Defendants entered into collusive referral arrangements with prescribing healthcare practitioners ("Prescribers") and unlicensed laypersons ("Clinic Controllers") who work at or are associated with multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-

Fault Clinics"). The Pharmacy Defendants' scheme, however, primarily involved a single licensed healthcare practitioner, Dr. McGee, and Clinic Controllers associated with three No-Fault Clinics located at 1552 Dahill Road, Brooklyn, New York (the "Dahill Road Clinic"), 132 32nd Street, Brooklyn, New York (the "32nd Street Clinic"), and 1218 Neptune Avenue, Brooklyn, New York (the "Neptune Avenue Clinic") (collectively, the "McGee Clinics") where Dr. McGee purports to operate a medical practice.

4. The Pharmacy Defendants, in exchange for paying kickbacks or providing other financial incentives, steered thousands of medically unnecessary prescriptions – including likely forged and unauthorized prescriptions – from Dr. McGee, the other Prescribers, and/or the Clinic Controllers to BHNV Exclusive pursuant to fraudulent predetermined protocols. Based on these collusive referral arrangements and predetermined protocols, the Pharmacy Defendants submitted to GEICO an enormous volume of fraudulent billing under the name of BHNV Exclusive – including more than $3.4 million for the Fraudulent Topical Pain Products.

5. The Pharmacy Defendants intentionally targeted the Fraudulent Pharmaceuticals to dispense to Insureds, in place of other effective but much less costly prescription and non-prescription drug products, without regard for genuine patient care and solely based on the medications' exorbitant pricing and high profit margins. In fact, approximately 96% of the billing submitted to GEICO through BHNV Exclusive was for the Fraudulent Topical Pain Products, with charges typically amounting to $4,299.01 per prescription of Diclofenac Sodium 2% Solution and $2,751.84 per prescription of LidoReal 4%-1% Patches. Notably, LidoReal 4%-1% Patches are classified as over-the-counter products and are non-reimbursable under the No-Fault Laws.

6. By this action, GEICO seeks to recover approximately $1,855,000.00 stolen from it by the Defendants, along with a declaration that GEICO is not legally obligated to pay

reimbursement to BHNV Exclusive of approximately $1,565,000.00 in pending fraudulent No-Fault claims for the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted through BHNV Exclusive because:

i. the Pharmacy Defendants billed for Fraudulent Pharmaceuticals that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

ii. the Pharmacy Defendants intentionally submitted unnecessary and inflated billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had BHNV Exclusive dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals;

iii. the Pharmacy Defendants participated in collusive referral relationships in violation of New York Public Health Law § 238-a, in which they steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct medically unnecessary and likely unauthorized prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for unlawful kickbacks and other financial incentives; and

iv. the Pharmacy Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals through BHNV Exclusive pursuant to prescriptions issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner.

7. The Defendants' scheme began in 2025 and continues uninterrupted to the present day as the Pharmacy Defendants continue to submit, or cause to be submitted, fraudulent claims to GEICO and pursue collection on BHNV Exclusive's unpaid fraudulent claims against GEICO, as well as other New York automobile insurers.

8. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants intentionally submitted unnecessary and inflated billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired

at low cost and had BHNV Exclusive dispense to Insureds in large volumes at exorbitant charges, in place of other effective, less costly pharmaceuticals; (iii) the Pharmacy Defendants participated in collusive referral relationships in which they steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct medically unnecessary and likely unauthorized prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for unlawful kickbacks and other financial incentives; and (iv) the Pharmacy Defendants submitted or caused to be submitted claims for the Fraudulent Pharmaceuticals pursuant to prescriptions issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner, all while continuing to seek reimbursement on unpaid fraudulent claims.

9. Based on the foregoing, the Pharmacy Defendants do not have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to date which the Pharmacy Defendants submitted, or caused to be submitted, to GEICO through BHNV Exclusive using the United States mail or through interstate wires seeking reimbursement under New York's No-Fault Law. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $1,855,000.00.

## THE PARTIES

### I. Plaintiffs

10. Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Bethesda, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II. <u>Defendants</u>**

11. Defendant BHNV Exclusive is a New York corporation incorporated on or about September 4, 2024, with its principal place of business at 5211 13th Avenue, Brooklyn, New York. BHNV Exclusive was first registered with the New York State Education Department, Office of the Professions on or about December 4, 2024.

12. Defendant Dayan resides in and is a citizen of New York and is the purported sole owner of BHNV Exclusive.

13. Defendant Dr. McGee resides in and is a citizen of New York. Dr. McGee became licensed to practice medicine in New York on December 19, 1985. Dr. McGee is one of the Prescribers.

14. Dr. McGee's prescriptions, or purported prescriptions, are the primary source of billing submitted to GEICO through BHNV Exclusive.

15. The John Doe Defendants are individuals and entities, presently not identifiable, who, along with the Pharmacy Defendants, participated in the fraudulent scheme perpetrated against GEICO by, among other things, participating in, assisting with, or facilitating the operation and control of BHNV Exclusive, the collusive referral agreements with Dr. McGee, the other Prescribers, and the Clinic Controllers, and/or the spearheading of the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care, and who, upon information and belief, reside in and are citizens of New York.

## <u>JURISDICTION AND VENUE</u>

16. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

18. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19. Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20. GEICO underwrites automobile insurance in the state of New York.

### I. An Overview of New York's No-Fault Laws

21. New York's "No-Fault" Laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22. No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

23. The No-Fault Laws limit reimbursement for pharmacy benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

24. An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Financial Services, formerly known as the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 Form").

25. Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

26. Pharmacies "may be held liable for medically unnecessary services" submitted to No-Fault insurers similar to other "downstream providers." See Gov't Emps. Ins. Co. v. Advanced Comp. Lab., L.L.C., 2020 WL 7042648 (E.D.N.Y. Dec. 1, 2020); Gov't Emps. Ins. Co. v. Wellmart RX, Inc., 435 F. Supp. 3d 443 (E.D.N.Y. 2020); see also Long Is. Radiology v. Allstate Ins. Co., 36 A.D.3d 763, 764 (2d Dep't 2007).

## II. An Overview of Pertinent Statutes and Regulations Relating to Pharmacies

27. Pursuant to New York Education Law § 6808(1), no person, firm, corporation, or association shall possess drugs, prescriptions, or poisons for the purpose of compounding,

dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

28. Pursuant to New York Public Health Law § 238-a(1)(a), a practitioner authorized to order or prescribe, among other things, pharmacy services may not make a referral for such services to a healthcare provider authorized to provide such services, including a pharmacy, where such practitioner – or immediate family member of such practitioner – has a financial relationship with the healthcare provider/pharmacy.

29. New York Public Health Law § 238-a(1) applies to "any arrangement or scheme" such as a cross-referral arrangement, which the practitioner or pharmacy knows or should know has a principal purpose of assuring referrals by the practitioner for pharmacy services to a particular pharmacy which, if the practitioner directly made the referrals to the pharmacy, would be in violation of this section. See N.Y. Pub. Health Law § 238-a(9).

30. Pursuant to New York Public Health Law § 238-a(1)(b) and § 238-a(7), a pharmacy shall not present to an insurer a bill or demand for payment for pharmacy services furnished in violation of § 238-a(1)(a) and the pharmacy and referring practitioner are jointly and severally liable to the insurer for any amounts collected.

31. Pursuant to 8 N.Y.C.R.R. § 29.1(b)(2), pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such a manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

32. Similarly, 8 N.Y.C.R.R. § 29.1(b)(3) prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other

consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

33. Pursuant to 8 N.Y.C.R.R. § 63.6(b)(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with OTC drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

34. New York Education Law § 6810(7)(a) prohibits pharmacies from dispensing a drug when the prescription form for that drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

35. Pursuant to New York Education Law § 6810(10), as of March 27, 2016, "no practitioner shall issue any prescription in this state, unless such prescription is made by electronic prescription from the practitioner to a pharmacy." Permitted exceptions include: (1) temporary technological or electrical outages, (2) a waiver granted to the practitioner by the New York State Commissioner of Health based on a demonstrated exceptional circumstance, (3) a reasonable determination by the practitioner that the use of electronic prescribing would cause a delay such that it would adversely affect the patient's medical condition, and (4) the prescription will be dispensed by a pharmacy outside of New York State. See also N.Y. Pub. Health Law § 281(3).

36. For any non-electronic prescriptions issued in the state, New York Education Law § 6810(11) and § 6810(12) require the prescriber to explicitly state in the patient's health record the specific exempt reason for why the prescription was issued in a manner other than electronically.

37. New York Education Law § 6810(9) prohibits persons and corporations not licensed to issue a prescription, from willfully causing prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

38. New York Education Law §§ 6512(2) and 6530(11), (18), and (19) prohibit aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services, which is considered a crime and/or professional misconduct.

39. Pursuant to N.Y. Comp. Codes R. & Regs. Tit. 10 § 910.2(f), a "prescription shall [only] be issued by a practitioner for legitimate medical purposes in good faith and in the course of his or her professional practice." Further, pursuant to N.Y. Comp. Codes R. & Regs. Tit. 10 § 910.2(f), an "order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law…."

40. New York Education Law § 6530(17) prohibits a professional licensee from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

41. New York Education Law § 6530(18) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services.

42. New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment,

rebate, splitting, or refunding of a fee in connection with professional care or services related to drugs and/or medications.

43. Pursuant to New York Education Law § 6808(2)(c), "[t]he names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

44. Pursuant to New York Education Law § 6808(2)(e), every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

45. Pursuant to New York Education Law § 6808(2)(e), pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

46. Pursuant to New York Education Law § 6808(2)(e), pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

47. Pursuant to New York Education Law § 6810(5), pharmacies are required to keep records of all prescriptions filled or refilled for a period of at least five years, which records shall indicate date of filling or refilling, prescriber's name, patient's name and address, and the name or initials of the pharmacist who prepared, compounded, or dispensed the prescription.

48. Further, pursuant to 8 N.Y.C.R.R. § 63.6(b)(7), each pharmacist shall maintain a patient medication profile, including, but not limited to, the patient's name, address, telephone number, gender, date of birth or age, known allergies and drug reactions, chronic diseases, a comprehensive list of medications, and any other information reported to the pharmacist that is appropriate for counseling an individual regarding use of prescription and OTC drugs.

## III. The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A. Overview of the Scheme

49. Beginning in 2025, and continuing uninterrupted through the present day, the Pharmacy Defendants implemented a fraudulent scheme in which they used BHNV Exclusive to exploit patients for financial gain by billing GEICO and the New York automobile insurance industry for over $3.7 million in inflated charges – which they were not entitled to receive – for the Fraudulent Pharmaceuticals purportedly dispensed to the Insureds.

50. BHNV Exclusive purports to be a storefront neighborhood pharmacy operating in and catering to the local community in Brooklyn, New York, when in fact, the Pharmacy Defendants used BHNV Exclusive as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals in a predetermined, protocol fashion, without regard for medical necessity, while intentionally ignoring a vast array of other medications readily available at a fraction of the cost.

51. The Pharmacy Defendants' scheme exploited accident victims who were primarily treating under the name and professional corporation of a single healthcare practitioner, Dr. McGee, who operated at the three McGee Clinics (i.e., the Dahill Road Clinic, 32nd Street Clinic, and Neptune Avenue Clinic), among other locations. The McGee Clinics are purported multidisciplinary "medical clinics" that purport to treat – and exploit – patients with No-Fault insurance, including by steering large volumes of medically unnecessary and likely unauthorized prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive.

52. Unlike a legitimate pharmacy that dispenses a broad range of pharmaceutical products, BHNV Exclusive's business targeted a limited set of pharmaceutical products that

accounted for the overwhelming majority of its claims submitted to GEICO. Indeed, approximately 96% of the Pharmacy Defendants' billing to GEICO was for the Fraudulent Topical Pain Products.

53. The Fraudulent Topical Pain Products overwhelmingly targeted by the Pharmacy Defendants included Lidocaine and Diclofenac products, with charges typically amounting to $4,299.01 per prescription of Diclofenac Sodium 2% Solution and $2,751.84 per prescription of LidoReal 4%-1% Patches.

54. The Pharmacy Defendants chose these products – Diclofenac Sodium 2% Solution and LidoReal 4%-1% Patches – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions, or purported prescriptions, to themselves. Moreover, the Pharmacy Defendants knew that similar OTC products that could be recommended to Insureds were not covered under the No-Fault Laws, thus leading the Pharmacy Defendants to target the prescription of Fraudulent Topical Pain Products such as Diclofenac Sodium 2% Solution despite the lack of medical necessity for these particular products.

55. Even more, the Pharmacy Defendants targeted and billed GEICO for excessive amounts of LidoReal 4%-1% Patches despite the fact that they are not entitled to reimbursement for this topical product under the No-Fault Laws. In fact, LidoReal 4%-1% Patches are classified as a "human OTC drug." See https://ndclist.com/ndc/81877-725.

56. Nonetheless, Dr. McGee and other Prescribers purportedly prescribed, and BHNV Exclusive purportedly dispensed, LidoReal 4%-1% Patches as a prescription drug in order to bill GEICO notwithstanding the fact that OTC products are not covered under the No-Fault Laws and the lack of medical necessity for these products.

57. Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services has noted that Lidocaine and Diclofenac are two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018). Moreover, the U.S. Department of Labor, Office of Workers' Compensation Programs has published a list of drugs, identified by their National Drug Code ("NDC"), for which reimbursement is unavailable and payment will be denied. See https://www.dol.gov/agencies/owcp/FECA/not_covered_ndc. This list includes the LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution that the Pharmacy Defendants allegedly dispensed to Insureds.

58. Defendant Dayan operates BHNV Exclusive for the sole purpose of effectuating a multimillion-dollar pharmacy fraud scheme.

59. Dayan is not a licensed pharmacist and did not own or operate any other pharmacy prior to becoming the sole record owner of BHNV Exclusive.

60. Dayan began operating BHNV Exclusive after purportedly "passing by" a pharmacy store location, noticed it was stocked but vacant, and purportedly was able to rent and operate there under a new the pharmacy name – BHNV Exclusive – all allegedly without knowing who the prior owner was, without paying for the existing stock in the location, and without paying to purchase the old pharmacy.

61. In actuality, in January 2025, Dayan joined a network of individuals and entities regularly involved in No-Fault insurance fraud who were familiar with the No-Fault Clinics and could arrange for fraudulent claims to be billed and collected as quickly as possible from New

York automobile insurance companies to generate large profits without regard to genuine patient care.

62. Upon joining the network, Dayan began targeting and receiving large volumes of prescriptions for the Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals.

63. BHNV Exclusive has only been registered and operated as a pharmacy since December 2024. Thereafter, beginning in January 2025, BHNV Exclusive suddenly began submitting substantial billing to GEICO as part of the Pharmacy Defendants' fraudulent scheme.

64. In fact, the Pharmacy Defendants submitted billing for purportedly dispensing more than $674,000 of pharmaceutical products to GEICO's Insureds alone, within the first four months of beginning operations in January 2025. The Pharmacy Defendants, in total, have billed GEICO <u>more than $3.7 million</u> for pharmaceuticals dispensed over the course of approximately 17 months – from January 2025 to May 2026.

65. It is highly unlikely that a legitimate "community retail pharmacy" would be able to generate so much billing in such a short period of time without any legitimate marketing or advertising efforts.

66. Upon information and belief, the sudden, voluminous billing from BHNV Exclusive coincided with the Pharmacy Defendants' engagement of Billing Experts Inc. ("Billing Experts"), Drug Lift Corp. ("Drug Lift"), Gary Tsirelman P.C. (the "Tsirelman PC"), and the Pharmacy Defendants' collusion with Dr. McGee, the other Prescribers, and the Clinic Controllers, in which the Pharmacy Defendants steered them to prescribe and direct large volumes of prescriptions – or purported prescriptions – to BHNV Exclusive for specifically targeted Fraudulent Pharmaceuticals, which were allegedly prescribed and dispensed to patients at the No-Fault Clinics.

67. Dayan is the purported sole owner of BHNV Exclusive but others presently unidentifiable (i.e., the John Doe Defendants) participated in the operation and/or control of BHNV Exclusive despite not being owners of record and facilitated collusive referral and financial arrangements designed to steer large volumes of prescriptions, or purported prescriptions, to BHNV Exclusive and generate large profits from the submission of fraudulent insurance claims to GEICO and other No-Fault insurers.

68. In furtherance of the fraudulent scheme, the Pharmacy Defendants, working with the John Doe Defendants, entered into complex financial arrangements with one another and others, including Dr. McGee, the other Prescribers, and the Clinic Controllers at the No-Fault Clinics, that were designed to, and did, conceal the fact that the Pharmacy Defendants unlawfully exchanged kickbacks or other financial incentives for large volumes of medically unnecessary prescriptions for specifically targeted Fraudulent Pharmaceuticals.

69. In discovery obtained in a separate federal No-Fault fraud action involving similar pharmacy billing and collections activity, GEICO identified millions of dollars in payments from a different pharmacy to an entity using "BHNV" in its name, despite the absence of any readily apparent business purpose or online business presence, further raising concerns regarding BHNV Exclusive's connection with individuals and/or entities regularly involved in No-Fault insurance fraud.

70. Upon information and belief, Dr. McGee and the other Prescribers were compensated by the Clinic Controllers or other John Doe Defendants, whether financially or through some other economic quid pro quo (e.g., the ability to treat the Insureds at the No-Fault Clinics and independently bill GEICO or, alternatively, employment by healthcare "practices" operating at the No-Fault Clinics) for Dr. McGee's and the other Prescribers' willingness to permit

prescriptions to be issued in their names and steered to specific pharmacies including BHNV Exclusive, rather than given to the Insureds or to a legitimate operating pharmacy.

71. The collusive nature of these arrangements extends beyond the payment of kickbacks or other financial incentives but also includes (i) the ability to secure the prescriptions without first or ever meeting the Prescribers and (ii) obtaining the prescriptions directly from the front desk staff at the various No-Fault Clinics, without any communication with or involvement by the Insureds.

72. The collusive referral and financial arrangements among the Pharmacy Defendants, Dr. McGee, the other Prescribers, and the Clinic Controllers are the very kind of collusive relationships that are prohibited by New York Public Health Law § 238-a, which expressly prohibits referrals for pharmacy services where the referring practitioner has a direct or indirect financial relationship with the pharmacy. Indeed, Public Health Law § 238-a(1)(b) and § 238-a(7) prohibit a pharmacy from billing for pharmacy services furnished in violation of § 238-a(1)(a) and render both the pharmacy and referring practitioner jointly and severally liable to the insurer for any amounts collected.

73. The prescriptions for the Fraudulent Pharmaceuticals steered to BHNV Exclusive were typically based on generic, preprinted, and boilerplate examination reports meant to justify continuous, voluminous, and excessive healthcare services, including prescriptions for pharmaceuticals, as part of predetermined protocols and collusive arrangements. Further, the Fraudulent Topical Pain Products themselves often had no proven efficacy beyond what an OTC equivalent could provide and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

74. Dr. McGee, the other Prescribers, and the No-Fault Clinics that were the source of the prescriptions steered to BHNV Exclusive have been the subject of investigations and lawsuits with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to genuine patient care.

75. Unlicensed laypersons (i.e., the Clinic Controllers), rather than the healthcare professionals working at the No-Fault Clinics, create and control the patient bases at the clinics, dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care, and select and dictate the downstream providers – like pharmacies – that receive prescriptions and referrals issued at the No-Fault Clinics. These predetermined protocols almost always involve the rendering and prescribing of excessive medically unnecessary healthcare goods and services and collusive referral and/or prescription practices.

76. In keeping with the fact that the prescriptions were the byproduct of collusive referral arrangements and fraudulent protocols, approximately 95% of the billing, or approximately $3.5 million, submitted to GEICO by the Pharmacy Defendants was based on prescriptions originating from practitioners associated with a single medical practice, Beach Medical Rehabilitation P.C. ("Beach Medical"), which is owned on paper by Dr. McGee. Of that amount, nearly 77%, or over $2.8 million, is attributable to prescriptions issued by Dr. McGee alone.

77. Dr. McGee has a history of being associated with healthcare fraud schemes. Dr. McGee and several of his professional corporations – including Beach Medical – were previously sued by multiple insurers based on allegations that Dr. McGee performed medically unnecessary healthcare services and allowed unlicensed laypersons to illegally exercise ownership and control

over his purported professional corporations and use them to submit fraudulent claims to No-Fault insurers. See Allstate Ins. Co., et al. v. Rauch, D.C., et al., 2:22-cv-02424 (JMA)(LGD) (E.D.N.Y. 2022); State Farm Mut. Auto. Ins. Co. v. McGee et al., 1:10-cv-03848 (PKC)(RML) (E.D.N.Y. 2010); see also Allstate Ins. Co., et al. v. Ilyaich, et al., 1:13-cv-05464 (NG)(LB) (E.D.N.Y. 2013). Further, Dr. McGee was sued by GEICO based on allegations that Dr. McGee engaged in illegal kickback and referral schemes and submitted fraudulent No-Fault charges to GEICO and other insurers for excessive and medically unnecessary healthcare services. See Gov't Emps. Ins. Co., et al. v. McGee, et al., 1:23-cv-07753 (NCM)(PK) (E.D.N.Y. 2023).

78. The McGee Clinics, where Dr. McGee purportedly worked and purportedly directed prescriptions to BHNV Exclusive, present themselves as legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers that subject patients to as many healthcare goods and services as possible to exploit their No-Fault Benefits and submit large volumes of fraudulent claims to No-Fault insurers like GEICO.

79. In fact, GEICO has received billing for purported healthcare services from a "revolving door" of more than 20 purportedly different healthcare provider "names" and tax identification numbers at the Dahill Road Clinic, 13 purportedly different healthcare provider "names" and tax identification numbers at the 32nd Street Clinic, and 8 purportedly different healthcare provider "names" and tax identification numbers at the Neptune Avenue Clinic, all purportedly rendering and billing for a high volume of medically unnecessary healthcare services.

80. In further keeping with the fact that the No-Fault Clinics were geared to exploiting New York's No-Fault insurance system, including through the prescribing and dispensing of the Fraudulent Pharmaceuticals, the initial examination reports issued by, or in the name of Dr.

McGee, included voluminous boilerplate lists of predetermined services and goods for virtually every Insured. For example:

**OVERALL PLAN:**

1. 30 Day medication including Pennsaid 2% Solution, Apply 2-3 times daily to affected areas, Lidocaine Ointment 5% 250 g and Cyclobenzaprine 7.5mg 90 Tablets will be prescribed
2. Physical Therapy and Chiropractic care 3-4x a week for 4-6 weeks.
3. Consider durable medical equipment for at home use including Game-Ready, SAM, Cervical Collar, Cervical Pillow, Lumbar Sacral Support, Lumbar Cushion, Bed Board, Egg Crate Mattress, Orthopedic Massage Chair, EMS unit 4 leads, TENS/EMS placement belt, Infrared Red Heating Lamp and Massager to the extent they are medically necessary.
4. To further rule out muscle tears, radiculopathy, and/or disc herniations, the following diagnostic testing has been ordered: EMG/NCV, and MRIs of Cervical Spine, Thoracic Spine, Lumbar Spine as medically indicated
5. Completed diagnostic testing has been reviewed with the patient and they have been referred to Orthopedic and/or Pain management specialists. Additional DME items such as custom bracing has been ordered as necessary.
6. Patient will present for follow-up exam in 3-4 weeks to assess progress and review results of diagnostic testing.
7. Equipo Medico Infrared Heat Pad with Low Level Light Therapy (LLLT) may be prescribed. This is an FDA Cleared device to treat and reduce musculoskeletal pain and inflammation.

| | |
|---|---|
| MRI of CERVICAL SPINE | RULE OUT HERNIATED DISC |
| MRI of LUMBAR SPINE | RULE OUT HERNIATED DISC |
| MRI of LEFT KNEE | RULE OUT ROTATOR CUFF TEAR |
| MRI of | RULE OUT |
| MRI of | RULE OUT |
| MRI of | RULE OUT |
| MRI of | RULE OUT |

I feel that there is a direct causal relationship between the accident described and the patient's current injuries to the described areas. The symptoms and clinical findings are consistent with musculoskeletal injuries to the described areas. At this point, the patient remains impaired with regard to some functional capabilities, as such; I would like to recommend that the patient receive physical therapy program to increase muscle strength and range of motion to the areas injured.

81. Based on the repetitive, boilerplate treatment plans including predetermined Fraudulent Pharmaceuticals, the Pharmacy Defendants were able to steer voluminous prescriptions, or purported prescriptions, to BHNV Exclusive from Dr. McGee and the Clinic Controllers as part of their collusive referral and financial arrangements, which prescriptions the Pharmacy Defendants used to bill for voluminous, excessive amounts of medically unnecessary pharmaceuticals.

82. In keeping with the fact that the Pharmacy Defendants illegally steered Dr. McGee, the other Prescribers, and the Clinic Controllers at the No-Fault Clinics to provide BHNV Exclusive with prescriptions pursuant to predetermined protocols and collusive referral

arrangements, the Insureds were virtually never given the option to use a pharmacy of their choosing.

83. After having the prescriptions steered to BHNV Exclusive, the Pharmacy Defendants purportedly delivered the Fraudulent Pharmaceuticals directly to the Insureds' residences, or alternatively, delivered the Fraudulent Pharmaceuticals to the No-Fault Clinics.

84. The Pharmacy Defendants used the prescriptions, or purported prescriptions, obtained from Dr. McGee, the other Prescribers, and the Clinic Controllers to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

85. In furtherance of the scheme, the Pharmacy Defendants used, and continue to use, Tsirelman PC to pursue collections from GEICO on the bills submitted for the Fraudulent Pharmaceuticals through BHNV Exclusive by filing numerous, separate, individual civil court lawsuits and/or expedited No-Fault arbitrations. Tsirelman PC, and potentially other law firms, routinely file these expensive and time-consuming collection proceedings against GEICO and other insurers, in piecemeal fashion, in order to obscure the fraud and monetize the scheme as quickly as possible, whenever the charges are not promptly paid in full. In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that BHNV Exclusive has been engaged in fraud.

86. The Pharmacy Defendants' collection efforts through numerous, separate No-Fault collection proceedings are an essential part of their fraudulent scheme since the Pharmacy Defendants know it is impractical for a single civil court judge or No-Fault arbitrator in a single civil court proceeding or No-Fault arbitration, typically involving a single bill, to uncover or address the Pharmacy Defendants' large scale, complex fraud scheme involving numerous Insureds across several different clinics located throughout the metropolitan area.

87. The Pharmacy Defendants implemented their pharmaceutical fraud scheme involving Dr. McGee, the other Prescribers, and the Clinic Controllers knowing that: (i) the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to genuine patient care; (ii) the Pharmacy Defendants intentionally submitted unnecessary and inflated billing to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had BHNV Exclusive dispense in large volumes to Insureds at exorbitant charges; (iii) the Fraudulent Topical Pain Products were the product of illegal, collusive referral relationships intended to inflate the billing from BHNV Exclusive to insurers and to financially enrich the Pharmacy Defendants; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of OTC and prescription medications proven to have therapeutic effects and available at a fraction of the cost.

88. Dr. McGee, the other Prescribers, and the Clinic Controllers would not have engaged in collusive referral arrangements with the Pharmacy Defendants in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to BHNV Exclusive, unless they profited from their participation in the scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

### B. <u>The Fraudulent Pharmaceuticals Were Prescribed and Dispensed For Financial Gain and Without Regard to Genuine Patient Care</u>

89. In basic terms, the goal of medical treatment is to help each patient get better in a timely manner and to provide an appropriate and medically necessary course of treatment for each patient's individual needs. Notwithstanding this basic goal, the Insureds treated by Dr. McGee and the other Prescribers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from BHNV Exclusive – were virtually always subjected to a predetermined,

medically unnecessary, and prolonged treatment protocol, which completely lacked individualized care and failed to utilize evidence-based medical practices with the goal of providing Insureds with medically appropriate and necessary treatment and a timely return to good health.

90. Evidence-based best practice guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or an oral non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. Oral NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

91. More recently, in 2019, the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report, which focused on pain management and the treatment of acute and chronic pain. According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate. Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., oral NSAIDs or acetaminophen) should be used as first-line therapy for patients for whom these medications are clinically appropriate.

92. Like the WHO and DHHS, the New York State Workers' Compensation Board's ("NYS WCB") published medical treatment guidelines states that oral NSAIDs are recommended as first-line medications for the treatment of neck and back pain, and that OTC medications should be tried prior to prescription NSAIDs. See New York State Workers' Compensation Board Medical Treatment Guidelines, Mid and Lower Back Injury (May 2022, p. 32, 36).

93. Drugs should not be prescribed when there is no indication for use as every medication carries an inherent risk for adverse events.

94. Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

95. Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. This includes patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

96. With respect to treating acute pain (e.g., from strains, sprains, contusions, or overuse injuries), clinical studies of FDA-approved topical NSAIDs, such as Diclofenac Gel 1%, have shown that they are no more effective than a placebo.

97. Despite these guidelines and the basic goal underlying the practice of medicine to help patients recover in a timely fashion, Dr. McGee and the other Prescribers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the healthcare providers at the various No-Fault Clinics

purported to render to Insureds – including the prescription of excessive and medically unnecessary pharmaceutical drug products.

98. Notwithstanding the creation of the examination reports, Dr. McGee and the other Prescribers' prescriptions for the Fraudulent Pharmaceuticals dispensed by BHNV Exclusive were based on predetermined protocols designed to exploit Insureds for financial gain, without regard to the genuine needs of the patients.

99. Indeed, the manner in which the Insureds were prescribed and dispensed the Fraudulent Pharmaceuticals reflects a protocol-driven scheme with little or no relationship to their clinical needs or medical histories, deviates from applicable medical standards of care, and demonstrates gross indifference to patient health and safety.

100. For example, the initial examination reports prepared by Dr. McGee and the other Prescribers virtually never stated any individualized medical need or basis for the prescriptions for the targeted Fraudulent Topical Pain Products.

101. Prescribing a multitude of pharmaceutical drug products based on generic, preprinted, and boilerplate examination reports lacking a detailed patient history demonstrates a gross indifference to patient health and safety.

102. Dr. McGee and the other Prescribers also did not document in their examination reports whether the Insureds were intolerant of oral medications or tried and failed any OTC topical medications necessitating a prescription for the Fraudulent Topical Pain Products dispensed by BHNV Exclusive.

103. Dr. McGee and the other Prescribers also often failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular Insured

and dispensed by BHNV Exclusive were actually used by the Insured, and, if so, whether they provided any pain relief or were otherwise effective for the purpose prescribed.

104. Moreover, Dr. McGee and the other Prescribers routinely failed to document in their examination reports that the Insured was to receive one or more of the particular Fraudulent Pharmaceuticals that were purportedly dispensed to the Insured.

105. Nevertheless, Dr. McGee and the other Prescribers routinely prescribed voluminous Fraudulent Topical Pain Products on the same date to a single Insured.

106. In keeping with the need for individualized care, each patient who has been involved in an accident, including motor vehicle accidents, is exposed to a set of unique mechanical events and their injuries are a direct result of those specific forces, hence their injuries are unique. In addition, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given motor vehicle accident.

107. Despite the fact that the Insureds were of different ages, heights, weights, and in different physical conditions, and likely reacted to the accidents in different ways, virtually all of the Insureds were unnecessarily prescribed large quantities of Fraudulent Pharmaceuticals in an excessive and systematic manner.

108. It is extremely improbable that multiple Insureds involved in the same motor vehicle accident would routinely require the same pharmaceutical products in voluminous quantities. Even so, pursuant to predetermined treatment protocols and unlawful, collusive referral arrangements, and as demonstrated herein, Dr. McGee and the other Prescribers purported to prescribe, and the Pharmacy Defendants dispensed the same set of Fraudulent Topical Pain

Products to multiple Insureds involved in a single motor vehicle accident, without regard to individualized, genuine patient care. For example:

- On August 30, 2025, two Insureds – JS and RM – were allegedly involved in the same motor vehicle accident. Thereafter, JS and RM sought treatment with Yampu Freeman, P.A. ("PA Freeman") and Elizabeth Lafargue, N.P. ("NP Lafargue") of Beach Medical at the 32nd Street Clinic. JS and RM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JS and RM were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

    - On October 1, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JS pursuant to prescriptions purportedly issued by Dr. McGee on September 9, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine. Moreover, in light of JS's medical history of hypertension, any NSAIDs – such as Diclofenac Sodium 2% Solution – should be prescribed with significant caution especially given the fact that the patient is taking medications to manage his hypertension. Despite this, there is no documentation that JS was advised on the use of NSAIDs in conjunction with medications for hypertension.

    - On October 30, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to RM pursuant to prescriptions purportedly issued by NP Lafargue on October 8, 2025, <u>one day before</u> the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by NP Lafargue did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On July 22, 2025, three Insureds – MD, AJ, and BL – were allegedly involved in the same motor vehicle accident. Thereafter, MD, AJ, and BL sought treatment with PA Freeman and Jahumi Harrigan, N.P. ("NP Harrigan") of Beach Medical at the Neptune Avenue Clinic. MD, AJ, and BL were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, MD, AJ, and BL were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

    - On July 25, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to BL pursuant to prescriptions purportedly issued by Dr. McGee on July 23, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment,

Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On July 26, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AJ pursuant to prescriptions purportedly issued by Dr. McGee on July 23, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On July 31, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MD pursuant to prescriptions purportedly issued by Dr. McGee on July 23, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On September 12, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to BL pursuant to prescriptions purportedly issued by Dr. McGee on September 10, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On September 16, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AJ pursuant to prescriptions purportedly issued by Dr. McGee on September 10, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On September 19, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MD pursuant to prescriptions purportedly issued by Dr. McGee on September 10, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On October 11, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to BL pursuant to prescriptions purportedly issued by Dr. McGee on October 8, 2025, one day before the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium

2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On October 21, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MD pursuant to prescriptions purportedly issued by Dr. McGee on October 8, 2025, one day before the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On November 12, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AJ pursuant to prescriptions purportedly issued by Dr. McGee on November 6, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On September 1, 2025, two Insureds – JR and RB – were allegedly involved in the same motor vehicle accident. Thereafter, JR and RB sought treatment with PA Freeman and NP Harrigan of Beach Medical at the Neptune Avenue Clinic. JR and RB were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JR and RB were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On September 12, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JR and RB pursuant to prescriptions purportedly issued by Dr. McGee on September 10, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine. In light of RB's medical history of hypertension, any NSAIDs – such as Diclofenac Sodium 2% Solution – should be prescribed with significant caution especially given the fact that the patient is taking medications to manage her hypertension. Despite this, there is no documentation that RB was advised on the use of NSAIDs in conjunction with medications for hypertension.

- On August 17, 2025, three Insureds – JL, ED, and EL – were allegedly involved in the same motor vehicle accident. Thereafter, JL, ED, and EL sought treatment with PA Freeman and NP Harrigan of Beach Medical at the 32nd Street Clinic. JL, ED, and EL were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JL, ED, and EL were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

- On September 6, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JL, ED, and EL pursuant to prescriptions purportedly issued by Dr. McGee on September 2, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On October 30, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JL and ED pursuant to prescriptions purportedly issued by Dr. McGee on October 28, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On November 7, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to EL pursuant to prescriptions purportedly issued by Dr. McGee on November 4, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On April 18, 2025, two Insureds – MO and AB – were allegedly involved in the same motor vehicle accident. Thereafter, MO and AB sought treatment with PA Freeman and NP Harrigan of Beach Medical at the 32nd Street Clinic. MO and AB were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, MO and AB were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On May 22, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MO and AB pursuant to prescriptions purportedly issued by Dr. McGee on May 20, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On July 7, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AB pursuant to prescriptions purportedly issued by Dr. McGee on July 3, 2025, two days after the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and

Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On July 10, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MO pursuant to prescriptions purportedly issued by Dr. McGee on July 8, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On November 25, 2025, three Insureds – AI, MP, and QM – were allegedly involved in the same motor vehicle accident. Thereafter, AI, MP, and QM sought treatment with PA Freeman and NP Harrigan of Beach Medical at the 32nd Street Clinic. AI, MP, and QM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, AI, MP, and QM were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On December 6, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to QM pursuant to prescriptions purportedly issued by Dr. McGee on December 2, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On December 7, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AI <u>and</u> MP pursuant to prescriptions purportedly issued by Dr. McGee on December 2, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On January 3, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AI pursuant to prescriptions purportedly issued by Dr. McGee on December 30, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On January 4, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MP pursuant to prescriptions purportedly issued by Dr. McGee on December 30, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment,

Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On January 29, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AI pursuant to prescriptions purportedly issued by Dr. McGee on January 20, 2026. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On February 5, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to QM pursuant to prescriptions purportedly issued by Dr. McGee on December 30, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On February 11, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MP pursuant to prescriptions purportedly issued by Dr. McGee on February 3, 2026. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On March 9, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to QM pursuant to prescriptions purportedly issued by Dr. McGee on January 27, 2026. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On April 1, 2025, two Insureds – YMN and YNA – were allegedly involved in the same motor vehicle accident. Thereafter, YMN and YNA sought treatment with Adelina Fazilov, N.P. ("NP Fazilov") of Beach Medical at the Dahill Road Clinic. YMN and YNA were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, YMN and YNA were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On April 12, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to YNA pursuant to prescriptions purportedly issued by Dr. McGee on April 8, 2025.

  - On May 17, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to YNA pursuant to prescriptions purportedly issued by Dr. McGee on May 6, 2025.

  - On June 9, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to YMN pursuant to prescriptions purportedly issued by Dr. McGee on June 4, 2025. Notably, the examination report failed to document the aforementioned prescribed medications and simply indicated "30 day medication."

  - On July 3, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to YNA pursuant to prescriptions purportedly issued by Dr. McGee on June 4, 2025.

- On August 15, 2025, two Insureds – GA and AD – were allegedly involved in the same motor vehicle accident. Thereafter, GA and AD sought treatment with PA Freeman and NP Harrigan of Beach Medical at the Neptune Avenue Clinic. GA and AD were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, GA and AD were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On August 30, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to GA <u>and</u> AD pursuant to prescriptions purportedly issued by Dr. McGee on August 27, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On September 27, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to GA pursuant to prescriptions purportedly issued by Dr. McGee on September 26, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On October 2, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AD pursuant to prescriptions purportedly issued by Dr. McGee on September 29, 2025, <u>three days after</u> the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On March 27, 2025, two Insureds – SR and PM – were allegedly involved in the same motor vehicle accident. Thereafter, SR and PM sought treatment with PA Freeman and NP Harrigan of Beach Medical at the 32nd Street Clinic. SR and PM were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, SR and PM were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

    - On April 12, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SR <u>and</u> PM pursuant to prescriptions purportedly issued by Dr. McGee on April 8, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On May 8, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to PM pursuant to prescriptions purportedly issued by Dr. McGee on May 6, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On May 10, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SR pursuant to prescriptions purportedly issued by Dr. McGee on May 6, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On June 13, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SR pursuant to prescriptions purportedly issued by Dr. McGee on June 10, 2025, <u>five days after</u> the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On June 17, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to PM pursuant to prescriptions purportedly issued by Dr. McGee on June 10, 2025, <u>five days after</u> the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On July 13, 2025, two Insureds – JDT and SB – were allegedly involved in the same motor vehicle accident. Thereafter, JDT and SB sought treatment with NP Fazilov of Beach Medical at the Dahill Road Clinic. JDT and SB were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, JDT and SB were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

    - On July 25, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SB pursuant to prescriptions purportedly issued by NP Fazilov on July 22, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by NP Fazilov did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On August 29, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JDT pursuant to prescriptions purportedly issued by NP Fazilov on August 27, 2025, <u>one day after</u> the purported examination. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by NP Fazilov did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On October 4, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JDT pursuant to prescriptions purportedly issued by Dr. McGee on September 30, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

    - On October 30, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SB pursuant to prescriptions purportedly issued by NP Fazilov on October 28, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by NP Fazilov did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On November 6, 2025, two Insureds – FD and AK – were allegedly involved in the same motor vehicle accident. Thereafter, FD and AK sought treatment with PA Freeman and NP Harrigan of Beach Medical at the Neptune Avenue Clinic. FD and AK were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, FD and AK were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

- On November 8, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AK pursuant to prescriptions purportedly issued by Dr. McGee on November 6, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On November 10, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to FD pursuant to prescriptions purportedly issued by Dr. McGee on November 6, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On December 5, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AK pursuant to prescriptions purportedly issued by Dr. McGee on December 3, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On December 6, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to FD pursuant to prescriptions purportedly issued by Dr. McGee on December 3, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

- On December 5, 2025, two Insureds – GG and KK – were allegedly involved in the same motor vehicle accident. Thereafter, GG and KK sought treatment with NP Fazilov of Beach Medical at the Dahill Road Clinic. GG and KK were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, GG and KK were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On March 7, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to KK pursuant to prescriptions purportedly issued by Dr. McGee on March 4, 2026. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment and Diclofenac Sodium 2%, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment.

  - On April 8, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to GG pursuant to prescriptions purportedly issued by NP Fazilov on March 31, 2026.

- On November 29, 2025, two Insureds – OK and PP – were allegedly involved in the same motor vehicle accident. Thereafter, OK and PP sought treatment with PA Freeman of Beach Medical at the Neptune Avenue Clinic. OK and PP were in different physical conditions and experienced the impact from different positions in the vehicle. Nonetheless, OK and PP were issued prescriptions for the same set of Fraudulent Topical Pain Products, namely, LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution.

  - On December 6, 2025, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to OK and PP pursuant to prescriptions purportedly issued by Dr. McGee on December 3, 2025. Notably, the examination reports documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On January 3, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to OK pursuant to prescriptions purportedly issued by Dr. McGee on December 31, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On January 5, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to PP pursuant to prescriptions purportedly issued by Dr. McGee on December 31, 2025. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On January 30, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to OK pursuant to prescriptions purportedly issued by Dr. McGee on January 28, 2026. Notably, the examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

  - On March 25, 2026, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to PP pursuant to prescriptions purportedly issued by Dr. McGee on March 18, 2026. Notably, the

examination report documented prescriptions for Lidocaine 5% Ointment, Diclofenac Sodium 2%, and Cyclobenzaprine, yet the prescriptions issued by Dr. McGee did not include Lidocaine 5% Ointment or Cyclobenzaprine.

109. These are only representative examples.

110. In further keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary, but rather prescribed and dispensed pursuant to profit-driven and predetermined treatment protocols and collusive referral arrangements, in many instances, the Pharmacy Defendants dispensed the targeted Fraudulent Pharmaceuticals many weeks after the prescriptions were purportedly issued by the Prescribers. For example:

- On September 16, 2025, Insured ME was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with NP Fazilov of Beach Medical at the Dahill Road Clinic. On March 24, 2026, nearly two months after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches, Diclofenac Sodium 2% Solution, and Cyclobenzaprine to ME pursuant to prescriptions purportedly issued by Dr. McGee on January 29, 2026.

- On November 25, 2025, Insured QM was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with PA Freeman of Beach Medical at the 32nd Street Clinic. On February 5, 2026, over five weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to QM pursuant to prescriptions purportedly issued by Dr. McGee on December 30, 2025. Thereafter, on March 9, 2026, nearly six weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to QM pursuant to prescriptions purportedly issued by Dr. McGee on January 27, 2026.

- On April 1, 2025, Insured YNA was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with NP Fazilov of Beach Medical at the Dahill Road Clinic. On July 3, 2025, nearly one month after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to YNA pursuant to prescriptions purportedly issued by Dr. McGee on June 4, 2025.

- On August 30, 2025, Insured JS was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with PA Freeman and NP Lafargue of Beach Medical at the 32nd Street Clinic. On October 1, 2025, three weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JS pursuant to prescriptions purportedly issued by Dr. McGee on September 9, 2025. Thereafter, on October 28, 2025,

nearly three weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches to JS pursuant to prescriptions purportedly issued by NP Lafargue on October 9, 2025. Further, on November 29, 2025, nearly four weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JS pursuant to prescriptions purportedly issued by Dr. McGee on November 4, 2025.

- On August 30, 2025, Insured RM was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with PA Freeman and NP Lafargue of Beach Medical at the 32nd Street Clinic. On October 30, 2025, three weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to RM pursuant to prescriptions purportedly issued by NP Lafargue on October 8, 2025, one day before the purported examination. Notably, the prescriptions issued by NP Lafargue failed to identify a supervising physician as required by New York law.

- On November 28, 2025, Insured YS was allegedly involved in a motor vehicle accident, and thereafter, sought treatment with NP Fazilov of Beach Medical at the Dahill Road Clinic. On December 28, 2025, nearly three weeks after the prescriptions were issued, BHNV Exclusive dispensed LidoReal 4%-1% Patches to YS pursuant to prescriptions purportedly issued by NP Fazilov on December 9, 2025.

111. These are only representative examples.

112. The Pharmacy Defendants' delays in dispensing the Fraudulent Pharmaceuticals, after allegedly being prescribed to Insureds injured in motor vehicle accidents, are in keeping with the fact that the Fraudulent Pharmaceuticals were provided solely to exploit the patients for financial gain, without regard for medical necessity or genuine patient care.

113. Even so, pursuant to fraudulent, predetermined treatment protocols and collusive referral arrangements, and as demonstrated herein, Dr. McGee and the other Prescribers prescribed, and BHNV Exclusive dispensed, voluminous, excessive amounts of medically unnecessary pharmaceuticals, without regard to individualized, genuine patient care and safety.

### C. The Fraudulent Topical Pain Products

114. In accordance with the fraudulent scheme discussed above, and despite the best practices outlined above, BHNV Exclusive routinely billed GEICO for exorbitantly priced topical

pain gels, ointments, and patches, overwhelmingly in the form of LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution pursuant to duplicitous, invalid, and/or unauthorized prescriptions solicited from Dr. McGee, the other Prescribers, and the Clinic Controllers in exchange for kickbacks or other financial incentives.

i. The Fraudulent LidoReal Patches

115. In keeping with the fact that the Pharmacy Defendants, Dr. McGee, the other Prescribers, and the Clinic Controllers acted pursuant to fraudulent treatment protocols designed to maximize profits, and with gross indifference to patient care and safety, the Pharmacy Defendants obtained voluminous prescriptions and submitted over $1.2 million in claims to GEICO for LidoReal 4%-1% Patches – a non-reimbursable OTC product.

116. LidoReal 4%-1% Patches contain 4% Lidocaine and 1% Menthol. Lidocaine is a local anesthetic – numbing agent – that works by blocking nerve signals in the body, and Menthol is a topical analgesic – cooling agent – that causes a cooling sensation and provides temporary pain relief. LidoReal 4%-1% Patches are primarily indicated for temporary pain relief. Notably, LidoReal 4%-1% Patches do not penetrate the skin enough to treat deep musculoskeletal pain.

117. The FDA classifies LidoReal 4%-1% Patches as a "human OTC drug." See https://ndclist.com/ndc/81877-725. As noted above, the No-Fault Laws limit reimbursement for pharmacy benefits to prescription drugs only. OTC drug products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

118. Products similar to LidoReal 4%-1% Patches – containing 4% Lidocaine and 1% Menthol – are available for advertised prices in the range of $10 to $30.

119. Despite this, the Prescribers did not follow the typical conservative course of first-line treatment for minor aches and pains, which includes initially recommending or using readily

available OTC medications before escalating to prescription products. Instead, pursuant to collusive arrangements and predetermined protocols, the Prescribers routinely prescribed LidoReal 4%-1% Patches as first-line therapy and directed those prescriptions to BHNV Exclusive, which typically billed $2,751.84 per prescription.

120. Moreover, the LidoReal 4%-1% Patches dispensed and billed by the Pharmacy Defendants through BHNV Exclusive were manufactured, packaged, and/or distributed by Forreal Pharmaceuticals LLC, which is not a registered drug supplier, manufacturer, or wholesaler with the New York State Education Department, as required by the pharmacy law, raising further concerns relating to patient care and safety.

121. In further keeping with the fact that LidoReal 4%-1% Patches were prescribed and dispensed pursuant to collusive referral arrangements and predetermined protocols, the initial examination reports prepared by Dr. McGee and the other Prescribers virtually never set forth the medical basis for the prescriptions and routinely failed to acknowledge that the patient was even being prescribed the LidoReal 4%-1% Patches.

122. Likewise, the follow-up examination reports often failed to address whether the LidoReal 4%-1% Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

123. In fact, pursuant to these fraudulent protocols and collusive arrangements, Insureds often received prescriptions for LidoReal 4%-1% Patches, as well as other Fraudulent Topical Pain Products, as a matter of first-line therapy regardless of their age or individual medical histories, injuries, subjective complaints, or other factors. These prescriptions were regularly issued by

Prescribers at the time of the Insureds' initial examinations – within days of the accident – without the Prescribers first having recommended oral pain relievers or other OTC products. For example:

- On November 6, 2025, Insured FD was allegedly involved in a motor vehicle accident. Thereafter, on November 6, 2025, the day of the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to FD, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On November 6, 2025, Insured AK was allegedly involved in a motor vehicle accident. Thereafter, on November 6, 2025, the day of the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AK, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On January 24, 2025, Insured JG was allegedly involved in a motor vehicle accident. Thereafter, on January 28, 2025, only four days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to JG, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On December 3, 2025, Insured DT was allegedly involved in a motor vehicle accident. Thereafter, on December 9, 2025, only six days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to DT, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On November 25, 2025, Insured VM was allegedly involved in a motor vehicle accident. Thereafter, on December 3, 2025, only eight days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to VM, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On January 11, 2026, Insured SR was allegedly involved in a motor vehicle accident. Thereafter, on January 13, 2026, only two days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SR, which were dispensed and billed through BHNV Exclusive. Notably, the

examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On December 19, 2025, Insured SF was allegedly involved in a motor vehicle accident. Thereafter, on December 24, 2025, only five days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to SF, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On November 29, 2025, Insured OK was allegedly involved in a motor vehicle accident. Thereafter, on December 3, 2025, only four days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to OK, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On November 29, 2025, Insured PP was allegedly involved in a motor vehicle accident. Thereafter, on December 3, 2025, only four days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to PP, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On July 31, 2025, Insured MF was allegedly involved in a motor vehicle accident. Thereafter, on August 5, 2025, only five days after the accident, NP Fazilov prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MF, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On January 13, 2026, Insured DC was allegedly involved in a motor vehicle accident. Thereafter, on January 20, 2026, only seven days after the accident, NP Fazilov prescribed LidoReal 4%-1% Patches, Diclofenac Sodium 2% Solution, and Cyclobenzaprine to DC, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On July 22, 2025, Insured MD was allegedly involved in a motor vehicle accident. Thereafter, on July 23, 2025, only one day after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to MD, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On July 22, 2025, Insured AJ was allegedly involved in a motor vehicle accident. Thereafter, on July 23, 2025, only one day after the accident, Dr. McGee prescribed

LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AJ, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On July 22, 2025, Insured BL was allegedly involved in a motor vehicle accident. Thereafter, on July 23, 2025, only one day after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to BL, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

- On April 18, 2025, Insured AB was allegedly involved in a motor vehicle accident. Thereafter, on April 22, 2025, only four days after the accident, Dr. McGee prescribed LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution to AB, which were dispensed and billed through BHNV Exclusive. Notably, the examination report failed to even document the prescription for LidoReal 4%-1% Patches.

124. Pursuant to the fraudulent scheme, the Pharmacy Defendants have submitted over $1.2 million in pharmaceutical billing to GEICO for LidoReal 4%-1% Patches.

125. The Pharmacy Defendants' egregious billing for this OTC drug, coupled with Dr. McGee and the other Prescribers' routine failure to properly document the prescriptions for LidoReal 4%-1% Patches, or the Insureds' use of this medication, further indicates that there was no legitimate medical reason for Dr. McGee and the other Prescribers to have prescribed large volumes of LidoReal 4%-1% Patches to the Insureds, or for the Pharmacy Defendants to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects and the availability of comparably effective and less costly alternatives.

126. The Pharmacy Defendants plainly knew that their billing for LidoReal 4%-1% Patches sought reimbursement for exorbitantly priced products that were prescribed and dispensed without regard to genuine patient care and instead pursuant to the predetermined protocols and collusive arrangements described above because, among other things, the Pharmacy Defendants primarily dispensed only two products (LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution) in contrast to legitimate community pharmacies; the Pharmacy defendants solicited the

prescriptions for the patches, acquired and dispensed the patches; the Pharmacy Defendants knew the amounts charged and that substantially less costly comparable products were available; and the Pharmacy Defendants knew that LidoReal 4%-1% Patches were classified as OTC products not reimbursable under the No-Fault Laws.

ii. <u>The Fraudulent Diclofenac Prescriptions</u>

127. In addition to the excessive amounts of LidoReal 4%-1% Patches dispensed by BHNV Exclusive, and to further maximize their profits, the Pharmacy Defendants also routinely billed GEICO for exorbitantly priced Diclofenac Sodium 2% Solution pursuant to prescriptions solicited from Dr. McGee, the other Prescribers, and the Clinic Controllers.

128. As with the prescriptions for LidoReal 4%-1% Patches, the Pharmacy Defendants solicited Dr. McGee, the other Prescribers, and the Clinic Controllers to provide them with prescriptions for the Diclofenac Sodium 2% Solution so they could bill for these pharmaceutical products at exorbitant charges, which further inflated the charges submitted to GEICO and other New York No-Fault insurers.

129. The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

130. The "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

131. Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction and stroke, which can be fatal and (ii)

diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

132. Diclofenac Sodium 2% Solution is a topical NSAID that is only indicated to treat pain caused by osteoarthritis of the knees.

133. Despite the FDA-approved indications for the prescription and use of Diclofenac Sodium 2% Solution, Dr. McGee and the other Prescribers prescribed, and the Pharmacy Defendants dispensed, excessive amounts of Diclofenac Sodium 2% Solution to Insureds with no documented medical history of osteoarthritis of the knees.

134. In keeping with the fact that Diclofenac Sodium 2% Solution was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by Dr. McGee and the other Prescribers virtually never stated the medical basis for these prescriptions.

135. Moreover, Dr. McGee and the other Prescribers' follow-up examination reports often failed to address whether the Diclofenac Sodium 2% Solution prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

136. Notwithstanding the FDA-approved uses for Diclofenac Sodium 2% Solution, or the risks associated with diclofenac sodium prescriptions, Dr. McGee and the other Prescribers steered voluminous prescriptions to BHNV Exclusive for Diclofenac Sodium 2% Solution, and the Pharmacy Defendants dispensed and billed for these products in excessive amounts, pursuant to predetermined fraudulent protocols and collusive arrangements, without any genuine regard for patient care or safety, or the commercial availability of a wide range of FDA-approved

medications, as well as OTC medications, proven to have therapeutic effects and available at a fraction of the cost.

137. The Pharmacy Defendants submitted exorbitant charges to GEICO, typically billing $4,299.01 per prescription of Diclofenac Sodium 2% Solution, resulting in more than $2.1 million in billing to GEICO.

138. The Pharmacy Defendants plainly knew that their billing for Diclofenac Sodium 2% Solution sought reimbursement for exorbitantly priced products that were prescribed and dispensed without regard to genuine patient care and instead pursuant to the predetermined protocols and collusive arrangements described above because, among other things, the Pharmacy Defendants primarily dispensed only two products (LidoReal 4%-1% Patches and Diclofenac Sodium 2% Solution) in contrast to legitimate community pharmacies; the Pharmacy defendants solicited the prescriptions for the Diclofenac Sodium 2% Solution, acquired and dispensed the Diclofenac Sodium 2% Solution; the Pharmacy Defendants knew the amounts charged and that substantially less costly comparable products were available; and the Pharmacy Defendants knew that Diclofenac Sodium 2% Solution was not FDA approved for regular use beyond treatment for osteoarthritis of the knees.

**D. <u>The Exploitation of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among the Pharmacy Defendants, Dr. McGee, the Other Prescribers, and Clinic Controllers</u>**

139. To effectuate the fraudulent scheme, the Pharmacy Defendants steered Dr. McGee, the other Prescribers, and the Clinic Controllers to routinely prescribe and direct prescriptions to BHNV Exclusive for large volumes of the specifically targeted Fraudulent Pharmaceuticals

pursuant to their collusive referral arrangements, which egregiously inflated the charges submitted to GEICO.

140. As noted above, New York Public Health Law § 238-a prohibits Dr. McGee and the other Prescribers from making a referral for pharmacy services to a pharmacy or any other purveyor of pharmacy services where the practitioner – or immediate family member of the practitioner – has a financial relationship with the pharmacy or the purveyor of pharmacy services, which financial arrangement includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

141. Pursuant to New York Public Health Law § 238-a(1)(b) and § 238-a(7), a healthcare provider, like a pharmacy, shall not present to an insurer a bill or demand for payment for pharmacy services furnished in violation of § 238-a(1)(a) and the healthcare provider and referring practitioner are jointly and severally liable to the insurer for any amounts collected.

142. Notably, New York Public Health Law § 238-a(1) applies to "any arrangement or scheme" such as a cross-referral arrangement, which the practitioner or pharmacy knows or should know has a principal purpose of assuring referrals by the practitioner for pharmacy services to a particular pharmacy which, if the practitioner directly made the referrals to the pharmacy, would be in violation of this section.

143. New York's statutory framework also provides, among other things, that pharmacies and licensed medical professionals are prohibited from: (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party and (ii) "directly or indirectly" giving, soliciting, receiving,

or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

144. Here, the Pharmacy Defendants colluded with Dr. McGee, the other Prescribers, and the Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have Dr. McGee and the other Prescribers prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals and then have those prescriptions directed to BHNV Exclusive so that the Pharmacy Defendants could bill GEICO huge sums.

145. In furtherance of the scheme, Dr. McGee and the other Prescribers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to collusive referral arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

146. Dr. McGee and the other Prescribers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense, the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Topical Pain Products were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Topical Pain Products were often being prescribed with gross indifference to patient health, care, and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and the Fraudulent Topical Pain Products were prescribed without attention to cost and fiscal

responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

147. The Pharmacy Defendants, in collusion with Dr. McGee, the other Prescribers, and the Clinic Controllers, made sure the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to BHNV Exclusive.

148. After having the prescriptions steered to BHNV Exclusive, the Pharmacy Defendants purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, or alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by BHNV Exclusive directly from the front desk staff at the various No-Fault Clinics.

149. Dr. McGee and the other Prescribers had no legitimate medical reason to prescribe the Fraudulent Topical Pain Products in large quantities to the Insureds, and BHNV Exclusive had no legitimate reason to dispense the Fraudulent Topical Pain Products in large quantities to the Insureds.

150. Dr. McGee, the other Prescribers, and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Topical Pain Products to BHNV Exclusive.

151. The Pharmacy Defendants, Dr. McGee, the other Prescribers, and the Clinic Controllers would not have engaged in the collusive referral arrangements in violation of New York law, including intentionally prescribing the Fraudulent Topical Pain Products, and directing those prescriptions to BHNV Exclusive, unless they profited from their participation in the scheme.

152. Upon information and belief, Dr. McGee and the other Prescribers were compensated either directly by the Pharmacy Defendants or through some other economic "in kind" arrangement or scheme effectuated through the Clinic Controllers, such as a quid pro quo

arrangement that gave Dr. McGee and the other Prescribers the ability to treat the Insureds at the No-Fault Clinics and separately bill GEICO, in exchange for them issuing prescriptions for the Fraudulent Pharmaceuticals that the Pharmacy Defendants steered to BHNV Exclusive.

153. But for the payments of kickbacks or other financial incentives from the Pharmacy Defendants, either paid directly or through some other economic "in kind" arrangement or scheme, Dr. McGee and the other Prescribers would not have prescribed the Fraudulent Pharmaceuticals, and the Prescribers and Clinic Controllers would not have directed the prescriptions – or purported prescriptions – to BHNV Exclusive.

154. The Pharmacy Defendants, Dr. McGee, the other Prescribers, and the Clinic Controllers affirmatively concealed the particular amounts paid in kickbacks or other financial incentives for steering the prescriptions to BHNV Exclusive since such kickbacks and/or financial incentives are in violation of New York Public Health Law.

155. Nevertheless, based on the circumstances surrounding the collusive referral arrangements, the Pharmacy Defendants paid kickbacks or provided other financial incentives, and Dr. McGee, the other Prescribers, and the Clinic Controllers received kickbacks or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by BHNV Exclusive.

156. Upon information and belief, the payment of kickbacks or other financial consideration paid or provided by the Pharmacy Defendants was made at or near the time the prescriptions were issued.

## IV. <u>The Fraudulent Billing the Pharmacy Defendants Submitted or Caused to be Submitted to GEICO</u>

157. Every prescription product, whether a brand name or generic drug, has a designated NDC – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity

in which the drug was packaged. Each NDC number has an assigned average wholesale price ("AWP").

158. Each NDC – and, thus, the AWP – for a particular drug product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

159. The Pharmacy Defendants solicited Dr. McGee, the other Prescribers, and the Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Pharmacy Defendants could readily buy the Fraudulent Topical Pain Products at low cost, but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

160. The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate the billing submitted through BHNV Exclusive and to maximize their profits.

161. In support of its charges, BHNV Exclusive typically submitted: (i) an NF-3 Form which included the purported NDC numbers, units, and corresponding charges for each drug product; (ii) copies of Dr. McGee's or the other Prescribers' prescriptions; (iii) a delivery receipt or delivery tracking form; and (iv) an assignment of benefits form assigning the Insureds' benefits to the Pharmacy Defendants.

162. The NDC numbers listed on the NF-3 Forms submitted by the Pharmacy Defendants through BHNV Exclusive are what identified the purported AWPs for each of the Fraudulent Topical Pain Products.

163. The Pharmacy Defendants never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that they dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for the Fraudulent Topical Pain Products.

164. The Pharmacy Defendants paid only a fraction of the "average wholesale price" of the Fraudulent Topical Pain Products that the Pharmacy Defendants targeted to use in connection with the billing submitted through BHNV Exclusive, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA-approved, proven effective medications or commercially available OTC products.

## V. The Pharmacy Defendants' Submission of Fraudulent NF-3 Forms to GEICO

165. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits have been submitted to GEICO by and on behalf of BHNV Exclusive seeking payment for the pharmaceuticals for which BHNV Exclusive is not entitled to receive payment.

166. These forms, including NF-3 Forms and other supporting records that the Pharmacy Defendants submitted or caused to be submitted to GEICO, are false and misleading in the following material respects:

i. The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care;

ii. The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care, and that the charges were necessary, proper, and legitimate. In fact, the Pharmacy Defendants intentionally inflated the billable charges to GEICO by targeting a specific set of pharmaceutical products that BHNV Exclusive dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO;

iii. The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care and that the Pharmacy Defendants were legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners. In fact, the Pharmacy Defendants participated in collusive referral relationships in violation of N.Y. Pub. Health Law § 238-a, in which the Pharmacy Defendants steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct medically unnecessary and likely unauthorized prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for unlawful kickbacks and other financial incentives; and

iv. The NF-3 Forms and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care and that the Pharmacy Defendants were legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners. In fact, the Fraudulent Pharmaceuticals were medically unnecessary, and the Pharmacy Defendants dispensed the Fraudulent Pharmaceuticals pursuant to prescriptions that were issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner.

167. The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to date which the Pharmacy Defendants submitted, or caused to be submitted, to GEICO through the Pharmacies using the United States mail or through interstate wires seeking reimbursement under New York's No-Fault Law. For each fraudulent billing submission, the chart includes the particular pharmacy name; the claim number of the Insured; the date of the Insured's accident; the date the submission was mailed or wired to GEICO; the date the pharmacy allegedly provided the billed-for services; the National Drug Code ("NDC") number listed on the bill for each Fraudulent Pharmaceutical; the product description for each Fraudulent Pharmaceutical; and the dollar amount billed by the Pharmacy to GEICO for each Fraudulent Pharmaceutical.

168. As a direct result of the Defendants' scheme, and in reliance on the fraudulent billing submissions made through BHNV Exclusive, GEICO was led to voluntarily issue payments

to BHNV Exclusive totaling approximately $1,855,000.00 in response to the Pharmacy Defendants' fraudulent billing submissions.

## VI. **<u>The Pharmacy Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance</u>**

169. The Pharmacy Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for those products.

170. To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Pharmacy Defendants have gone to great lengths to systematically conceal their fraud.

171. Specifically, the Pharmacy Defendants knowingly have misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants were involved in collusive referral and kickback arrangements with Dr. McGee, the other Prescribers, and the Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance companies; (iii) the Pharmacy Defendants submitted prescriptions for LidoReal 4%-1% Patches as a prescription drug product in order to bill GEICO despite the fact that OTC products are not covered under the No-Fault Laws; and (iv) the prescriptions were unauthorized by a licensed healthcare practitioner and/or based on decisions made by laypersons rather than licensed healthcare practitioners.

172. The billing and supporting documentation submitted by the Pharmacy Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, do not reveal its fraudulent nature.

173. Because the billing and supporting documentation submitted by the Pharmacy Defendants did not reveal their fraudulent nature, GEICO voluntarily issued payments in response to the Pharmacy Defendants' billing submissions in accordance with the No-Fault Laws.

174. As noted above, as part of their fraudulent scheme, the Pharmacy Defendants have hired Tsirelman PC to pursue collection from GEICO and other insurers of the fraudulent charges submitted through BHNV Exclusive. Tsirelman PC routinely files numerous, individual, expensive, and time-consuming collection proceedings, in piecemeal fashion, against GEICO and other insurers if the charges are not promptly paid in full, in order to monetize the Defendants' fraudulent activity as quickly as possible. In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that BHNV Exclusive has been engaged in fraud.

175. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $1,855,000.00 representing voluntary payments made by GEICO based upon the submission of the fraudulent charges by the Pharmacy Defendants to GEICO, which damages are to be trebled under 18 U.S.C. § 1962(c), et seq. to $5,565,000.00.

176. Based upon the Pharmacy Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed the Complaint.

**<u>THE FIRST CLAIM FOR RELIEF</u>**
**Against the Pharmacy Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

177. GEICO incorporates as though fully set forth herein each and every allegation in the paragraphs set forth above.

178. There is an actual case and controversy between GEICO and the Pharmacy Defendants regarding approximately $1,565,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Pharmacy Defendants submitted or caused to be submitted to GEICO through BHNV Exclusive.

179. BHNV Exclusive has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants billed for pharmaceutical products that were medically unnecessary and/or prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

180. BHNV Exclusive has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants intentionally submitted unnecessary and inflated billable charges to GEICO by targeting a specific set of pharmaceutical products that BHNV Exclusive dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

181. BHNV Exclusive has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants participated in collusive referral relationships in violation of N.Y. Pub. Health Law § 238-a, in which the Pharmacy Defendants steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct

medically unnecessary and likely unauthorized prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for kickbacks or other financial incentives.

182. BHNV Exclusive has no right to receive payment for any pending bills submitted to GEICO for the Fraudulent Pharmaceuticals because the Pharmacy Defendants submitted or caused to be submitted charges for the Fraudulent Pharmaceuticals dispensed by BHNV Exclusive pursuant to prescriptions issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner.

183. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Pharmacy Defendants have no right to receive payment for any pending bills for the Fraudulent Pharmaceuticals submitted to GEICO through BHNV Exclusive.

**THE SECOND CLAIM FOR RELIEF**
**Against Dayan**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

184. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

185. BHNV Exclusive is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4) that engages in activities which affect interstate commerce.

186. Dayan knowingly conducted and/or participated, directly or indirectly, in the conduct of BHNV Exclusive's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and/or federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis seeking payments that BHNV Exclusive was not entitled to receive under the No-Fault Laws because: (i)

the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants intentionally submitted unnecessary, inflated billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had BHNV Exclusive dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iii) the Pharmacy Defendants participated in collusive referral relationships in violation of N.Y. Pub. Health Law § 238-a in which the Pharmacy Defendants steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for unlawful kickbacks and other financial incentives; and (iv) the billed-for pharmaceutical products were dispensed pursuant to prescriptions issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

187. BHNV Exclusive's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud and wire fraud are the regular way in which Dayan operated BHNV Exclusive, inasmuch as BHNV Exclusive never was entitled to bill for or collect No-Fault Benefits, and acts of mail fraud and wire fraud therefore were essential in order for BHNV Exclusive to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud and wire fraud implies a threat of continued criminal activity, as does the fact that the Pharmacy Defendants

continue to submit, or cause to be submitted, fraudulent claims to GEICO, and continue to attempt collection on the fraudulent billing submitted through BHNV Exclusive to the present day.

188. BHNV Exclusive is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York No-Fault insurance system; engage in collusive arrangements involving prescriptions for the Fraudulent Topical Pain Products; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by BHNV Exclusive in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

189. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,855,000.00 pursuant to the fraudulent bills submitted by the Pharmacy Defendants through BHNV Exclusive.

190. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE THIRD CLAIM FOR RELIEF**
**Against Dayan and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

191. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

192. BHNV Exclusive is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4) that engages in activities that affect interstate commerce.

193. Dayan and the John Doe Defendants are employed by or associated with the BHNV Exclusive enterprise.

194. Dayan and the John Doe Defendants knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of BHNV Exclusive's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and/or federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mail and/or interstate wires to submit or cause to be submitted thousands of fraudulent charges on a continuous basis that BHNV Exclusive was not entitled to receive under the New York No-Fault insurance laws because: (i) the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Pharmacy Defendants intentionally submitted unnecessary, inflated billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had BHNV Exclusive dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iii) the Pharmacy Defendants participated in collusive referral relationships in violation of N.Y. Pub. Health Law § 238-a, in which the Pharmacy Defendants steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for unlawful kickbacks and other financial incentives; and (iv) the billed-for pharmaceutical products were dispensed pursuant to prescriptions issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner. The fraudulent bills and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

195. Dayan and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

196. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,855,000.00 pursuant to the fraudulent bills submitted by the Pharmacy Defendants through BHNV Exclusive.

197. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against BHNV Exclusive, Dayan, and the John Doe Defendants**
**(Common Law Fraud)**

198. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

199. BHNV Exclusive, Dayan, and the John Doe Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of BHNV Exclusive.

200. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for pharmaceutical products were medically necessary and properly billed when in fact the billed-for pharmaceutical products were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that BHNV Exclusive was properly and legitimately

billing for and dispensing medically necessary pharmaceuticals independently selected by various prescribing practitioners, when in fact the Pharmacy Defendants intentionally submitted unnecessary, inflated billable charges to GEICO by targeting a specific set of pharmaceutical products that they acquired at low cost and had BHNV Exclusive dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iii) in every claim, the representation that BHNV Exclusive was properly and legitimately billing for and dispensing medically necessary pharmaceuticals independently selected by various prescribing practitioners when in fact the Pharmacy Defendants participated in collusive referral relationships in violation of N.Y. Pub. Health Law § 238-a, in which the Pharmacy Defendants steered Dr. McGee, the other Prescribers, and the Clinic Controllers to direct prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive in exchange for unlawful kickbacks and other financial incentives; and (iv) in every claim, the representation that BHNV Exclusive was legitimately filling prescriptions for medically necessary pharmaceuticals independently selected by various prescribing practitioners when in fact the billed-for pharmaceutical products were dispensed pursuant to prescriptions issued as a result of decisions made by laypersons and/or which were unauthorized by a licensed healthcare practitioner.

201. BHNV Exclusive, Dayan, and the John Doe Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BHNV Exclusive that were not compensable under the No-Fault Laws.

202. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $1,855,000.00 pursuant to the fraudulent bills submitted through BHNV Exclusive.

203. BHNV Exclusive, Dayan, and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

204. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE FIFTH CLAIM FOR RELIEF**
**Against BHNV Exclusive, Dayan, and the John Doe Defendants**
**(Unjust Enrichment)**

205. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

206. As set forth above, BHNV Exclusive, Dayan, and the John Doe Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

207. As a result of BHNV Exclusive's, Dayan's, and the John Doe Defendants' improper, unlawful, and/or unjust acts, GEICO reasonably believed that it was legally obligated to pay the bills submitted by BHNV Exclusive.

208. BHNV Exclusive, Dayan, and the John Doe Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that BHNV Exclusive, Dayan, and the John Doe Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

209. BHNV Exclusive, Dayan, and the John Doe Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

210. By reason of the above, BHNV Exclusive, Dayan, and the John Doe Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $1,855,000.00.

**THE SIXTH CLAIM FOR RELIEF**
**Against BHNV Exclusive and Dr. McGee**
**(New York Public Health Law § 238-a)**

211. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

212. Section 238-a of the New York Public Health Law provides, in relevant part:

> 1. (a) A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services may not make a referral for such services to a healthcare provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such healthcare provider.
>
> (b) A healthcare provider or a referring practitioner may not present or cause to be presented to any individual or third party payer, or other entity, a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

213. Pursuant to Section 238-a(7) of the New York Public Health Law, "[i]f a referring practitioner or a healthcare provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services or any other person or entity, collects any amounts that were billed in violation of this section, such referring

practitioner and healthcare provider and other person or entity shall be jointly and severally liable to the payer for any amounts so collected."

214. Pursuant to Section 238(3) of the New York Public Health Law, a "financial relationship" includes an ownership interest, investment interest, or compensation arrangement. For purposes of Section 238-a, a compensation arrangement means "any arrangement involving remuneration between a practitioner, or immediate family member, and a healthcare provider" and "includes any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." See N.Y. Pub. Health Law § 238-a(5)(a).

215. Defendant BHNV Exclusive is a "healthcare provider" as that term is defined under Section 238(6) of the New York Public Health Law.

216. Defendant Dr. McGee and the other Prescribers are "practitioners" as that term is defined under Section 238(11) of the New York Public Health Law.

217. BHNV Exclusive and Dr. McGee had a "financial relationship" as that term is defined under Section 238(3) of the New York Public Health Law and routine referrals were made to BHNV Exclusive by Dr. McGee for pharmacy services; specifically, the dispensing of the Fraudulent Pharmaceuticals.

218. The Pharmacy Defendants regularly steered prescriptions from Dr. McGee to BHNV Exclusive, and Dr. McGee regularly made referrals in the form of electronically transmitted prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive, pursuant to collusive referral and financial arrangements, whether directly or indirectly, including pursuant to an arrangement or scheme which the Pharmacy Defendants and Dr. McGee knew or should have known had the principal purpose of assuring referrals by Dr. McGee to BHNV Exclusive.

219. The referrals by Dr. McGee to BHNV Exclusive violate Section 238-a of the New York Public Health Law.

220. Further, in violation of Section 238-a(1)(b) of the New York Public Health Law, BHNV Exclusive has submitted, or caused to be submitted, to GEICO claims for payment for pharmacy services, in the form of the bills for the Fraudulent Pharmaceuticals, furnished pursuant to a prohibited referral.

221. GEICO has paid approximately $1,855,000.00 to BHNV Exclusive pursuant to the fraudulent bills for pharmacy services that BHNV Exclusive submitted or caused to be submitted to GEICO in violation of Section 238-a of the New York Public Health Law.

222. Pursuant to Section 238-a(7) of the New York Public Health Law, GEICO is entitled to recover such amounts from BHNV Exclusive, as a healthcare provider, and Dr. McGee, as a referring practitioner, who are jointly and severally liable to GEICO for the amounts collected by BHNV Exclusive.

**<u>THE SEVENTH CLAIM FOR RELIEF</u>**
**Against Dr. McGee and the John Doe Defendants**
**(Aiding and Abetting Fraud)**

223. GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

224. Dr. McGee and the John Doe Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by the Defendants, including the Pharmacy Defendants.

225. The acts of Dr. McGee and the John Doe Defendants in furtherance of the fraudulent scheme include knowingly purporting to prescribe the Fraudulent Pharmaceuticals in predetermined, protocol fashion, participating in unlawful, collusive referral relationships with the

Pharmacy Defendants by prescribing and directing predetermined prescriptions for the Fraudulent Pharmaceuticals to BHNV Exclusive, and permitting Dr. McGee's name to be used in the billing, prescription records, and treatment reports submitted in support of the Fraudulent Pharmaceuticals that were used solely to maximize profits without regard for genuine patient care.

226. The conduct of Dr. McGee in furtherance of the fraudulent scheme was significant and material, with approximately $2.8 million in charges to GEICO for the Fraudulent Pharmaceuticals purportedly dispensed by BHNV Exclusive resulting from medically unnecessary prescriptions from Dr. McGee.

227. Further, Dr. McGee's conduct was necessary and critical to the success of the fraudulent scheme because without his actions, there would be no opportunity for the Pharmacy Defendants to submit facially valid billing for the Fraudulent Pharmaceuticals and to obtain large payments from GEICO and other insurers.

228. The conduct of the John Doe Defendants in furtherance of the fraudulent scheme also was significant and material, as the fraud scheme is complex and multi-faceted, and they assisted with and/or facilitated the operation and control of BHNV Exclusive, the collusive referral agreements with Dr. McGee, the other Prescribers, and the Clinic Controllers, and/or the spearheading of the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care, among other things.

229. Dr. McGee and the John Doe Defendants undertook the above wrongful acts and conduct knowing that the scheme to defraud GEICO and other New York automobile insurance companies involved (i) prescribing and dispensing Fraudulent Pharmaceuticals that were not medically necessary and were prescribed and dispensed pursuant to predetermined fraudulent protocols, without regard for genuine patient care; (ii) engaging in unlawful, collusive referral and

financial arrangements to generate large volumes of predetermined prescriptions for the Fraudulent Pharmaceuticals that could be directed to BHNV Exclusive; (iii) submitting billing from BHNV Exclusive to GEICO and other New York automobile insurance companies that was inflated as a result of the issuance of predetermined, protocol prescriptions for expensive Fraudulent Topical Pain Products designed solely to maximize profits; and (iv) intentionally targeting a specific set of pharmaceutical products that BHNV Exclusive could acquire at low cost and bill for at exorbitant prices despite the availability of OTC and other effective, less costly pharmaceuticals that could have been prescribed and dispensed to the patients.

230. Dr. McGee and the John Doe Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO to pay charges to BHNV Exclusive for medically unnecessary and illusory Fraudulent Pharmaceuticals that were not compensable under the No-Fault Laws.

231. The conduct of Dr. McGee and the John Doe Defendants caused GEICO to pay approximately $1,855,000.00 pursuant to the fraudulent bills that the Pharmacy Defendants submitted or caused to be submitted to GEICO.

232. Dr. McGee's and the John Doe Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

233. Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory damages from Dr. McGee and the John Doe Defendants in an amount to be determined at trial, but in the approximate amount of $1,855,000.00, along with punitive damages, interest and costs, and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A. On the First Claim for Relief against the Pharmacy Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that BHNV Exclusive has no right to receive payment for any pending bills submitted to GEICO, amounting to approximately $1,565,000.00;

B. On the Second Claim for Relief against Dayan, compensatory damages in favor of GEICO in an amount to be determined at trial, but approximately $1,855,000.00, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Claim for Relief against Dayan and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial, but approximately $1,855,000.00, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Claim for Relief against BHNV Exclusive, Dayan, and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial, but approximately $1,855,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fifth Claim for Relief against BHNV Exclusive, Dayan, and the John Doe Defendants, a recovery in favor of GEICO in an amount to be determined at trial, but approximately $1,855,000.00, together with costs, interest and such other and further relief as this Court deems just and proper;

F. On the Sixth Claim for Relief against BHNV Exclusive and Dr. McGee, compensatory damages, jointly and severally, in favor of GEICO in an amount to be determined at trial, but approximately $1,855,000.00, and such other and further relief as this Court deems just and proper; and

G. On the Seventh Claim for Relief against Dr. McGee and the John Doe Defendants, compensatory damages, jointly and severally, in favor of GEICO in an amount to be determined at trial, but approximately $1,855,000.00, and such other and further relief as this Court deems just and proper.

Dated: November 3, 2026
Uniondale, New York

RIVKIN RADLER LLP

By: /s/ *Michael A. Sirignano*
Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Steven Henesy, Esq.
Jennifer Abreu, Esq.
Conor E. Byrnes, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*liza*
*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

4932-3482-3078, v. 9